**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| PARADISE TAILS INC.,<br>REEL FAITH FISHING LLC,<br>ERICK BRAVO, JOSE D. HERNANDEZ, and<br>all others similarly situated,<br><br>               Plaintiffs,<br><br>    v.<br><br>D & D SEAFOOD CORPORATION,<br>KEYS FISHERIES, INC.,<br>DENNIS DOPICO a/k/a Snake, and<br>GARY GRAVES.<br><br>              Defendants. | Civil Case No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.    **INTRODUCTION** ................................................................................................ 3

II.   **PARTIES** ............................................................................................................ 8

    A.   PLAINTIFFS ....................................................................................................... 8

    B.   DEFENDANTS ..................................................................................................... 9

    C.   KNOWN CO-CONSPIRATORS ............................................................................ 11

    D.   UNNAMED DEFENDANTS AND CO-CONSPIRATORS ........................................... 16

    E.   AGENTS AND AFFILIATES ................................................................................. 17

III.  **JURISDICTION AND VENUE** ....................................................................... 18

IV.   **FACTUAL ALLEGATIONS** ............................................................................ 19

    A.   STONE CRABS AND SPINY LOBSTERS ............................................................... 19

    B.   OVERVIEW OF THE STONE CRAB AND SPINY LOBSTER MARKET ...................... 21

    C.   DEFENDANTS' PRICE-FIXING CONSPIRACY ...................................................... 24

    D.   COLLUSION WAS ENABLED BY MARKET STRUCTURE AND CHARACTERISTICS .............. 29

        1.   Growing Market Concentration ...................................................................... 29

        2.   Consolidation Trends and Anticompetitive Risks .......................................... 29

        3.   Barriers to Entry ............................................................................................. 30

        4.   Motivation to Collude ..................................................................................... 31

        5.   Fragmented and Vulnerable Seller Market ..................................................... 32

        6.   Standardization of Products ............................................................................ 33

        7.   Opportunities for Coordination ...................................................................... 34

        8.   Demand Inelasticity and Lack of Substitutes ................................................. 34

    E.   ANTICOMPETITIVE EFFECTS AND HARM TO COMPETITION .............................. 34

        1.   Suppression of Fishermen's Prices ................................................................. 35

        2.   Volume of Commerce Affected ...................................................................... 35

      3.    Seasonal Concentration of Harm ................................................................ 35

      4.    Downstream and Community Impact ......................................................... 36

      5.    Lack of Legitimate Business Justification ................................................ 37

V.     **STATUTES OF LIMITATIONS** ................................................................ 37

VI.    **CLASS ACTION ALLEGATIONS** ......................................................... 38

VII.   **PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY** ................... 40

VIII.  **CLAIMS FOR RELIEF** ......................................................................... 41

IX.    **PRAYER FOR RELIEF** ........................................................................ 45

X.     **JURY DEMAND** .................................................................................. 45

Plaintiffs Paradise Tails Inc., Reel Faith Fishing LLC, Erick Bravo, and Jose D. Hernandez, on behalf of themselves and all others similarly situated bring this Class Action Complaint ("Complaint") for damages and injunctive relief against Defendants. Plaintiffs make the following allegations based on actual knowledge as to their own actions, facts, and circumstances, and upon information and belief and the reasonable investigation of counsel as to all other matters.

## I.   INTRODUCTION

1.     Plaintiffs bring this action to challenge Defendants' unlawful agreement to suppress and eliminate competition by fixing the prices paid to fishermen for stone crab claws and spiny lobsters (the "Relevant Products") in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Florida Antitrust Act, and common law unjust enrichment. From at least as early as June 2017 through April 2025 (the "Class Period"), Defendants coordinated their purchasing conduct to eliminate competition among themselves, depress prices paid to fishermen, and artificially widen Defendants' profit margins to the detriment of fishermen.

2.     The heart of the Defendants' conspiracy is simple. Prior to the commencement of the fishing season for spiny lobsters (typically August 6 through March 31) and stone crabs (typically October 15 through May 1), the Defendants, along with other unnamed co-conspirators, would gather together in a paradigmatic "smoke-filled room" to agree upon the initial prices they would pay fishermen for each pound of these products brought to dock. The Defendants would then coordinate throughout the season to adjust prices in lockstep. If any purchasers offered fishermen prices above the agreed-upon fixed price, those purchasers faced various repercussions from the Defendants and their unnamed co-conspirators.

3.     This conduct prevents fishermen from benefiting from market competition and accrues solely to the benefit of the Defendants, their Co-conspirators, and their unnamed co-conspirators. As an inexorable result, many Florida fishermen have sustained devastating economic consequences which, because of the impact of the commercial fishing industry on Florida's overall economy, has significant and far-reaching impacts on Florida as a whole.

4.      Florida's fisheries are "of great economic, social, and cultural importance to the state."[1] Commercial and recreational fishing supported $24.6 billion in economic activity in 2022 alone,[2] with stone crab and spiny lobster standing out as the backbone of the state's commercial seafood economy. Specifically, "Florida fishermen landed 96.2 million pounds of fish worth $286.5 million (wholesale value)" in 2023 alone.[3] Spiny lobster was the single most valuable species landed statewide that year, with $42.6 million in annual dockside value, while stone crab ranked a close second at $41.9 million.[4] The dockside volume of commerce for stone crab claws and spiny lobsters harvested by fishermen in the last two years is approximately $169 million and since 2017 exceeds $300 million. Together, these two products accounted for more than 40% of the total value of all Florida commercial landings (i.e., all seafood brought to the Florida shore for commercial sale), making stone crab claws and spiny lobsters uniquely important to the state's seafood industry.[5] The following chart illustrates the value of commercial landings over the past decade:

---

[1] Lorenzen, Kai; Ainsworth, Cameron H.; Baker, Shirley M.; Barbieri, Luiz R.; Camp, Edward V.; Dotson, Jason R.; and Lester, Sarah E., *Climate Change Impacts on Florida's Fisheries and Aquaculture Sectors and Options for Adaptation, in Florida's Climate: Changes, Variations, & Impacts*, Florida State University, 2017, pg. 428.

[2] *Fisheries Economics of the United States 2022*, US Department of Commerce National Oceanic and Atmospheric Administration Fisheries Office of Science and Technology, 2022. This figure includes fishermen's sales as well as related retail, restaurant, and supply-chain impacts.

[3] *See Florida Seafood and Aquaculture Overview and Statistics*, FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES Division of Marketing and Development, December 2, 2024, pg. 6.

[4] *Florida Seafood and Aquaculture Overview and Statistics*, FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES Division of Marketing and Development, December 2, 2024.

[5] *Id*.

FIGURE 1



Source: Florida Seafood and Aquaculture Overview and Statistics, FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES Division of Marketing and Development, December 2, 2024, pg. 6.

5.     The significance of the stone crab and spiny lobster fisheries to Florida cannot be overstated. These fisheries support more than 3,500 jobs, generate over $435 million in total annual economic impact, and sustain working waterfronts from Key West and the Florida Keys through Fort Myers and Tampa Bay, and up the Atlantic coast to Mayport and Cape Canaveral.[6] They are the economic lifeblood of many communities, "supporting jobs in shipbuilding and maintenance, marinas, restaurants, marine equipment, retail stores, and many other statewide industries."[7]

6.     The Defendants' price fixing conspiracy was executed against the backdrop of a severe, decade-long decline in statewide stone crab landings that created a supply crisis beginning in 2012. This decline, driven by factors including warming waters and environmental pressures, was so significant that state regulators intervened. [8] In 2020, the Florida Fish and Wildlife Conservation Commission shortened the fishing season and increased the minimum harvestable

---

[6] *Id.*
[7] *Id.* at 7.
[8] https://www.heraldtribune.com/story/news/2012/10/14/a-boost-from-stone-crabs/29127641007/; https://www.soundingsonline.com/features/stone-silent.

claw size, despite industry objections, in an effort to allow the crab population to recover.[9] This well-documented supply shortage should have resulted in record-high dockside prices for fishermen as a basic function of supply and demand.

7.     Indeed, in periods when and in regions where competitive forces briefly prevailed, this scarcity drove prices to unprecedented levels, with wholesale prices for the most desirable claws soaring to as much as $50 per pound.[10] This demonstrates the substantial prices a competitive market could bear and stands in stark contrast to the suppressed prices paid by the cartel.

8.     The conspiracy's effects were so pervasive that they crushed competitive pricing even in regions experiencing broader economic booms While stone crab and spiny lobster production declined on Florida's Gulf coast, Florida's Atlantic coast saw a significant increase in the total value of all commercial seafood landings, creating a thriving local seafood economy.[11] During the same period, however, Florida's Atlantic coast saw a significant increase in the total value of all commercial seafood landings, creating a thriving local seafood economy. In a competitive market, this regional boom would have increased demand and competition for all seafood, including the Relevant Products, driving prices even higher. Yet, due to the Defendants' price-fixing scheme, Atlantic coast fishermen were robbed of this opportunity. The conspiracy imposed an artificial price ceiling on stone crabs and spiny lobsters, forcing fishermen to sell their

---

[9] https://subscriber.politicopro.com/article/eenews/2020/10/20/annual-stone-crab-claw-harvest-begins-with-new-rules-009541; https://wsvn.com/news/local/florida-shortens-stone-crab-season-over-industry-objections/.

[10] https://www.nbcmiami.com/news/local/record-prices-for-stone-crab-claws-amid-scarcity/1944195/

[11] *See, e.g.,* Florida Fish and Wildlife Conservation Commission, Status and Trends of the Florida Stone Crab, *Menippe spp., Fishery* (reporting that over 80% of landings historically come from the west coast of Florida, with the most significant declines centered there).

catch at suppressed prices dictated by the cartel, thereby severing them from the benefits of their own region's flourishing market.[12]

9.      This scheme systematically destroyed fishermen's profit margins across the state. By artificially suppressing dockside prices, the Defendants ensured that revenues often failed to cover the high and rising costs of fuel, bait, and equipment.[13] This created a powerful disincentive to fish that threatened the livelihood of fishing families and the economic health of coastal communities, inflicting widespread harm on fishermen across Florida.[14]

10.     Defendants' concealment of their conspiracy from Plaintiffs and the proposed class ended no earlier than September 16, 2025, when the Antitrust Division of the United States Department of Justice announced that Defendant Dennis Dopico, the Vice President of Defendant D&D Seafood Corporation, waived indictment and pleaded guilty to a one-count Information filed in the United States District Court for the Southern District of Florida. The Information charged Dennis Dopico with participating in a conspiracy to suppress and eliminate competition by fixing the prices paid to fishermen for stone crab claws and spiny lobsters harvested in Florida from at least as early as July 2023 through in or around April 2025, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

11.     As a result of Defendants' conspiracy, fishermen during the Class Period have been underpaid at least tens of millions of dollars for their stone crab claw and spiny lobster harvests. To remedy Defendants' conspiracy and injury to the market, Plaintiffs and the proposed class seek

---

[12] *See* Florida Department of Agriculture and Consumer Services, *2024 Florida Seafood Quick Facts* (2024) (showing a 63.6% increase in the value of all seafood landings on the Atlantic coast from 2013-2023).

[13] https://www.miamiherald.com/news/business/article39052929.html; https://www.sun-sentinel.com/2010/08/06/florida-commercial-lobster-fishermen-hope-for-a-better-season-than-in-recent-years/

[14] https://www.sun-sentinel.com/2010/08/06/florida-commercial-lobster-fishermen-hope-for-a-better-season-than-in-recent-years/; https://www.miamiherald.com/news/local/community/florida-keys/article260852477.html (explaining that even when prices are high, fuel costs "offset much of the money commercial captains netted")

compensatory damages to be trebled in accordance with the antitrust laws, injunctive relief, and attorneys' fees.

## II.   PARTIES

### A.   Plaintiffs

12.   Plaintiff Paradise Tails Inc. is a commercial fishing business based in Marathon, Florida. It harvested and sold stone crab claws and spiny lobsters during the Class Period. Plaintiff sold such harvests directly to one or more Defendants, including D&D Seafood Corporation, at prices that were artificially suppressed as a result of Defendants' conspiracy and were underpaid as a result. Plaintiff was thereby injured in its business or property and is a proper representative of the Class defined below.

13.   Plaintiff Reel Faith Fishing LLC is a commercial fishing business based in Key West, Florida. It harvested and sold stone crab claws and spiny lobsters during the Class Period. Plaintiff sold such harvests directly to one or more Defendants, including D&D Seafood Corporation, at prices that were artificially suppressed as a result of Defendants' conspiracy and were underpaid as a result. Plaintiff was thereby injured in its business or property and is a proper representative of the Class defined below.

14.   Plaintiff Erick Bravo is a commercial fisherman based in Marathon, Florida. He harvested and sold stone crab claws during the Class Period. Plaintiff sold such harvests directly to one or more Defendants, including D&D Seafood Corporation, at prices that were artificially suppressed as a result of Defendants' conspiracy and was underpaid as a result. Plaintiff was thereby injured in his business or property and is a proper representative of the Class defined below.

15.   Plaintiff Jose D. Hernandez is a commercial fisherman based in Marathon, Florida. He harvested and sold stone crab claws and spiny lobsters during the Class Period. Plaintiff sold such harvests directly to one or more Defendants, including D&D Seafood Corporation, at prices that were artificially suppressed as a result of Defendants' conspiracy and was underpaid as a

result. Plaintiff was thereby injured in his business or property and is a proper representative of the Class defined below.

16. Collectively, Plaintiffs bring this action on behalf of themselves and all others similarly situated under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to address violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and recover damages, equitable relief, and attorneys' fees and costs.

**B.    Defendants**

17. Defendant D&D Seafood Corporation ("D&D") is a Florida corporation located in this District with its principal place of business located at 2771 NW 24th Street, Miami, Florida 33142. D&D operates as a seafood wholesaler and seafood processing center. D&D purchased stone crab claws and spiny lobsters from fishermen in Florida during the Class Period. Key players at D&D include Defendant Dennis Dopico, Mario Robin Dopico (company President), and George Teruel (company Secretary).

18. Defendant Dennis Dopico, also known as "Snake," is an individual residing in Florida. On information and belief, he resides at 8760 SW 87th Street, Miami, Florida 33173. Dennis Dopico is the Vice President of Defendant D&D. Dennis Dopico was involved in the purchase stone crab claws and spiny lobsters from Florida fishermen in Florida during the Class Period.

19. Defendant Keys Fisheries, Inc. ("Keys Fisheries") is a Florida corporation located in this District with its principal place of business located at 3390 Gulfview Avenue, Marathon, Florida 33050. Stephen Sawitz is the President of Keys Fisheries. Defendant Gary Graves is the company's Vice President. Keys Fisheries operates as a major seafood wholesaler and processor in the Florida Keys. Keys Fisheries purchased stone crab claws and spiny lobsters from fishermen in Florida during the Class Period.

20. Defendant Gary Graves is an individual residing in Florida. On information and belief, he resides at 5630 Standing Oaks Ln #16, Naples, Florida, 34119. Gary Graves is the Vice

President of Keys Fisheries. Gary Graves was involved in purchasing stone crab claws and spiny lobsters from Florida fishermen in Florida during the Class Period.

21.     Defendant Gary Graves is not merely an officer of Keys Fisheries but is the principal operator who directs its purchasing and pricing decisions. He is consistently identified in public-facing media as the person who "runs Keys Fisheries" and the primary individual who "buys stone crabs from the commercial fisherman" for the enterprise.[15] Keys Fisheries also serves as the main supplier for the iconic Joe's Stone Crab restaurant in Miami Beach.[16] For over forty years, Graves has operated Keys Fisheries, growing it into what has been described as the state's largest producer of stone crabs.[17] He controls a vertically integrated operation that includes a fleet of at least 28 fishing boats, giving him substantial power to dictate market terms.[18]

22.     Defendant Graves has publicly expressed a clear motive for the price-fixing conspiracy. In response to periods of low supply and high market prices, Graves lamented the conditions, stating his preference for "really good volume with reasonable prices."[19] From a buyer's perspective, "reasonable prices" are stable, predictable, and artificially low—the exact outcome of a price-fixing agreement. This statement is a direct admission that Graves and Keys Fisheries viewed competitive, high dockside prices as a threat to their business model, providing a clear motive to collude and suppress the prices paid to fishermen.

23.     During prior periods of scarcity, Defendant Graves acknowledged that the high costs of fuel, crew, and bait—up to $1,200 per day for a trapping trip—meant that meager catches might not even cover fishermen's costs.[20] Despite this awareness of the economic pressures on fishermen, Graves and Keys Fisheries participated in the conspiracy to fix prices at artificially low

---

[15] https://www.miamiherald.com/news/business/article39052929.html;
https://keysweekly.com/42/keys-stone-crabs-high-demand-low-supply-equals-big-money/

[16] https://www.miamiherald.com/entertainment/restaurants/article1948151.html

[17]  https://www.nationalfisherman.com/gulf-south-atlantic/stone-crab-landings-hit-bottom

[18] http://www.findeatdrink.com/Index/Etc/Entries/2014/12/4_stone_crabs.html

[19] https://www.gainesville.com/story/news/2013/10/14/florida-s-stone-crab-season/31854501007/

[20] https://www.miamiherald.com/entertainment/restaurants/article1948151.html

levels, ensuring that fishermen's revenues would be suppressed while their own profit margins were protected. Graves publicly stated that in such conditions, "No one [fishermen or fish houses] is making money," and described the situation as "hand to mouth,"[21] yet the conspiracy ensured that any financial shortfall was borne by the fishermen, not the wholesalers.

### C.       Known Co-Conspirators

24.     Plaintiffs are informed and believe, and on that basis allege, that in addition to the named Defendants, there exist other entities and individuals who knowingly joined and participated in the conspiracy to suppress and fix the prices paid to Florida fishermen for stone crab claws and spiny lobsters. Plaintiffs reserve the right to name additional co-conspirators and/or some or all of these entities as Defendants at a later date.

25.     Co-Conspirator Billy's Stone Crabs, Inc. ("Billy's") is a Florida corporation located in this District with its principal place of business located at 400 N. Ocean Drive, Hollywood, Florida 33019. Billy's Stone Crabs operates as a seafood wholesaler and restaurant group. Billy's purchased stone crab claws and spiny lobsters from Florida fishermen in Florida during the Class Period. Throughout the Class Period, Billy's acted as co-conspirator of Defendants by coordinating and agreeing upon the dockside prices to be paid for stone crabs and spiny lobsters and by implementing and enforcing those suppressed prices.

26.     Billy's was founded by William "Captain Billy" Hershey, a long-time figure in the South Florida seafood industry who began his career as a manager for the wholesale division of Joe's Stone Crab before establishing his own seafood business in the 1970s.[22] This enterprise grew to include a fleet of over 35 independent fishing boats[23], making Billy's a major buyer and supplier of the Relevant Products throughout South Florida. Upon information and belief, this control over a substantial portion of the fishing fleet gave Billy's significant market power and the ability to

---

[21] *Id.*

[22] https://www.sun-sentinel.com/2018/11/14/review-billys-stone-crab-in-hollywood-is-no-joes-and-thats-ok/

[23] *Id.*

influence and enforce the cartel's suppressed prices. Upon information and belief, following Mr. Hershey's passing in 2019, the business continued to be operated by his family, who carried forward its dominant market position throughout the Class Period.

27.     Billy's operates as both a major wholesaler and a direct-to-consumer retailer through its well-known waterfront restaurants and its national shipping website, www.crabs.com.[24] Upon information and belief, this vertically integrated model provided a powerful motive to suppress the dockside prices paid to fishermen. By artificially lowering its primary input cost—the price of stone crab claws and spiny lobsters—Billy's stood to dramatically increase the profit margin on every pound of product sold through its high-volume wholesale, restaurant, and e-commerce channels, thereby profiting from the alleged conspiracy at the fishermen's expense.

28.     Upon information and belief, the Billy's enterprise expanded its wholesale operations through affiliated companies, including BSC Fisheries, LLC, located on Summerland Key. This fish house serves as a major purchasing hub in the Florida Keys, sourcing stone crabs and lobsters from a fleet of over 50 independent fishing boats.[25] This extensive purchasing network amplified Billy's market power, allowing it to control a significant volume of the Relevant Products at their source and enforce the conspiracy's fixed prices across a wide swath of the fishery.

29.     Upon information and belief, this vertically integrated model provided a powerful motive to suppress the dockside prices paid to fishermen. By artificially lowering its primary input cost—the price of stone crab claws and spiny lobsters—Billy's stood to dramatically increase the profit margin on every pound of product sold through its high-volume wholesale, restaurant, and e-commerce channels, thereby profiting from the alleged conspiracy at the fishermen's expense.

30.     Co-Conspirator Ernest Hamilton Stone Crabs Corp. ("Ernest Hamilton Stone Crabs") is a Florida corporation located in this District with its principal place of business located

---

[24] https://crabs.com/
[25] https://bscfisheries.com/

at 11 Washington Avenue, Miami Beach, Florida 33139. Stephen Sawitz is the President of Ernest Hamilton Stone Crabs. Ernest Hamilton Stone Crabs is a seafood wholesaler and processor. Ernest Hamilton Stone Crabs purchased stone crab claws from fishermen in Florida during the Class Period. Throughout the Class Period, Ernest Hamilton Stone Crabs acted as co-conspirator of Defendants by coordinating and agreeing upon the dockside prices to be paid for stone crabs and spiny lobsters and by implementing and enforcing those suppressed prices.

31.     Co-Conspirator Stone Crabs, Inc. ("Stone Crabs, Inc.") is a Florida corporation with its principal place of business located in this District at 11 Washington Avenue, Miami Beach, Florida 33139. Stephen Sawitz is the company's Secretary and Director. Stone Crabs, Inc. purchased stone crab claws and spiny lobsters from fishermen in Florida during the Class Period. Throughout the Class Period, Stone Crabs Inc. acted as co-conspirator of Defendants by coordinating and agreeing upon the dockside prices to be paid for stone crabs and spiny lobsters and by implementing and enforcing those suppressed prices.

32.     On information and belief, Co-Conspirators Ernest Hamilton Stone Crabs Corp. and Stone Crabs, Inc. are integral parts of a vertically integrated enterprise that sources, processes, and sells the Relevant Products for the world-famous Joe's Stone Crab restaurant in Miami Beach. These corporations share the same principal place of business as the restaurant—11 Washington Avenue, Miami Beach—and are controlled by the same individuals, including Stephen Sawitz, who serves as President of Ernest Hamilton Stone Crabs Corp. and COO of the restaurant. Upon information and belief, these entities function as a dedicated wholesale and procurement arm for the Joe's enterprise, providing them with immense buyer power and a direct financial motive to suppress the prices paid to fishermen to benefit the enterprise's overall profitability.

33.     Upon information and belief, Co-Conspirator Ernest Hamilton Stone Crabs Corp. leverages its namesake's deep historical roots in the industry to exert influence. The company is named for Ernest Hamilton, a pioneer credited with helping establish the commercial stone crab

industry in Everglades City, a major landing hub for the Gulf of Mexico fishery.[26] This historical connection to the heart of the stone crab industry provided this company with deep-rooted influence and market intelligence, particularly on Florida's west coast. This long-standing presence and influence in a key geographic market provided the opportunity and ability to help enforce the price-fixing conspiracy among fishermen and other buyers in that region.

34.     The enterprise associated with these Co-Conspirators has a documented history of leveraging its market power to pay what fishermen have alleged are unsustainably low prices. In October 2013, a fishermen's strike was organized to protest the low prices being offered by Joe's Stone Crab.[27] This historical precedent demonstrates a pattern of conduct consistent with the allegations herein and underscores the long-standing power imbalance between the concentrated group of buyers, including the conspirators' affiliates, and the fragmented fishing fleet.

35.     Co- Conspirator Golden Dragon Seafood Inc. ("Golden Dragon Seafood") is a Florida corporation with its principal place of business located at 890 15th Street Ocean Marathon, FL 33050. Golden Dragon Seafood operates as a seafood processor and distributor, purchasing the Relevant Products for resale to domestic and international markets.

36.     Upon information and belief, Co-Conspirator Golden Dragon is a key participant in the lucrative live export market for spiny lobsters to China. Golden Dragon is listed by the National Oceanic and Atmospheric Administration (NOAA) as one of the few U.S. establishments approved to export live seafood to China.[28] This position in the high-value export chain provided Golden Dragon with a powerful motive to join the price-fixing conspiracy. By colluding with other Defendants to suppress the dockside prices it paid to fishermen, Golden Dragon could significantly widen its profit margins on the valuable live lobsters it shipped to Asia, thereby directly benefiting from the alleged anticompetitive scheme.  Throughout the Class Period, Golden Dragon acted as

---

[26] https://gulfshorelife.com/people/sacred-ritual-that-starts-floridas-stone-crab-season/

[27] https://www.miamiherald.com/latest-news/article1956332.html

[28] National Oceanic and Atmospheric Administration, List of Establishments and Products for Export to the People's Republic of China for Live Seafood, (Sept. 10, 2024), https://www.fisheries.noaa.gov/s3/2024-11/China-Live-List-9.10.2024.pdf

co-conspirator of Defendants by coordinating and agreeing upon the dockside prices to be paid for stone crabs and spiny lobsters and by implementing and enforcing those suppressed prices.

37.     Co-Conspirator Key Largo Fisheries, Inc. ("Key Largo Fisheries") is a Florida corporation with its principal place of business located at 310 Sound Drive Key Largo, FL 33037. Key Largo Fisheries purchases and processes Florida stone crab claws and spiny lobsters and distributes them to wholesale, retail, and export customers. Key Largo Fisheries purchased stone crab claws and spiny lobsters from fishermen in Florida during the Class Period. Throughout the Class Period, Key Largo Fisheries acted as co-conspirator of Defendants by coordinating and agreeing upon the dockside prices to be paid for stone crabs and spiny lobsters and by implementing and enforcing those suppressed prices.

38.     Co-Conspirator Key Largo Fisheries, Inc., during the Class Period, was owned and operated by Tom Hill, who, like Defendant Graves, regularly commented on market prices and acted as a public face for the wholesale industry.[29] Upon information and belief, Key Largo Fisheries participated in the conspiracy by coordinating its pricing with Defendants and adhering to the agreed-upon suppressed prices. The significant value of this single fish house stands in stark contrast to the economic hardship faced by fishermen; its reported $10.5 million sale price during the Class Period demonstrates the substantial profits available to the wholesale businesses engaged in the alleged conduct.[30]

39.     Co-Conspirator Key Largo Fisheries is a long-standing, entrenched player in the market. Founded in 1972 by the Hill family, the business grew from a small operation into a major seafood supplier in the Florida Keys over the course of five decades.[31] Upon information and belief, this multi-generational presence established Key Largo Fisheries as a dominant and

---

[29] https://keysweekly.com/42/keys-stone-crabs-high-demand-low-supply-equals-big-money/ (identifying Hill as the "owner/manager of Key Largo Fisheries, which also buys stone crab from commercial fishermen").

[30] https://keysweekly.com/42/we-got-crabs-keys-fishermen-and-women-are-catching-more-getting-paid-more/; https://keysweekly.com/42/a-look-inside-the-fish-house/

[31] https://keyslifemagazine.com/little-by-little-a-legacy-is-built-key-largo-fisheries/

influential buyer with deep-rooted relationships, which it leveraged to promote and maintain the price-fixing conspiracy within the close-knit fishing community.

40.     Upon information and belief, Co-Conspirator Key Largo Fisheries furthered the conspiracy by actively concealing the prices it paid to fishermen. During the Class Period, when asked about dockside prices, its owner Tom Hill would only admit that the price paid to fishermen was "elevated" while expressly refusing to reveal the exact prices.[32] This refusal to provide price transparency was, on information and belief, a tactic consistent with the cartel's goal of preventing fishermen from discovering higher potential prices and leveraging them in negotiations, thereby reinforcing the artificially suppressed price structure.

41.     Co-Conspirator AIFA Seafood Inc. ("AIFA") is a Florida corporation located in this District with its principal place of business located at 30 NW 12th Street, Florida City, FL 33034. AIFA purchases and processes Florida spiny lobsters and distributes them to wholesale, retail, and export customers, specifically customers in China. AIFA purchased spiny lobsters from fishermen in Florida during the Class Period. Throughout the Class Period, AIFA acted as co-conspirator of Defendants by coordinating and agreeing upon the dockside prices to be paid for spiny lobsters and by implementing and enforcing those suppressed prices. In 2023, AIFA's president, Jiu Fa Chen and the company AIFA, pled guilty to exporting falsely labeled spiny lobster from Florida to China.[33]

### D.     Unnamed Defendants and Co-conspirators

42.     Various other persons, firms, and corporations, some of whose identities are presently unknown to Plaintiffs, have participated as co-conspirators with Defendants in the unlawful agreement to suppress and fix the prices paid to Florida fishermen for stone crab claws and spiny lobsters. These unnamed Defendants and co-conspirators joined and participated in the

---

[32] https://keysweekly.com/42/keys-stone-crabs-high-demand-low-supply-equals-big-money/

[33] *See United States of America v. AIFA Seafood Inc.*, No. 1:22-cr-20479-MORENO (Mar. 8, 2023) Dkt No. 32.

conspiracy by participating in meetings hosted by Defendants, communicating with Defendants about pricing, aligning dockside prices, and enforcing the collusive scheme.

43. These unnamed entities and individuals performed acts and made statements in furtherance of the conspiracy, and Defendants are jointly and severally liable for the acts of all such co-conspirators, whether or not they are specifically named as defendants in this Complaint.

44. Plaintiffs will seek leave to amend this Complaint to name these unnamed Defendants and co-conspirators once their identities and precise roles become known through investigation and discovery.

### E.    Agents and Affiliates

45. Whenever this Complaint refers to any act, deed, or transaction of any corporation or other business entity, the allegation means that the corporation or business entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

46. Each Defendant acted as the agent or joint venturer of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged in this Complaint. The acts alleged were done through Defendants and their use of Defendants' subsidiaries, affiliates, divisions, or other related entities and through their respective officers, directors, employees, agents, or representatives, who were acting within the scope of their authority and for the benefit of their respective principals.

47. To the extent that any parent companies, subsidiaries, or affiliates of Defendants participated in, facilitated, or benefitted from the conduct alleged herein, Plaintiffs reserve the right to name them as additional Defendants as their identities and roles become known through discovery.

## III.    JURISDICTION AND VENUE

48.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

49.    This Court also has jurisdiction over any supplemental state law claims under 28 U.S.C. § 1367, because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

50.    The Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k) and 15 U.S.C. § 22, which permits a lawsuit to be filed against a corporation in any district where the corporation may be found or transacts business and allows all process in such cases to be served in any district where the corporation may be found.

51.    The Court has personal jurisdiction over each Defendant because they are either residents of Florida or have engaged in substantial business here. Further, jurisdiction is proper because Defendants committed tortious acts within Florida—namely, orchestrating and implementing a price-fixing conspiracy in Florida that directly harmed Florida-based fishermen at the point of sale. Defendants purposefully availed themselves of the benefits and protections of Florida's laws while conducting their unlawful scheme. Jurisdiction is additionally appropriate under the "conspiracy theory of jurisdiction" recognized by the Florida Supreme Court, as well as on the basis that Defendants purposefully placed the Relevant Products into the stream of commerce from Florida. *Execu-Tech Business Sys., Inc. v. New Oji Paper Co., Ltd.*, 752 So. 2d 582 (Fla. 2000). This Court has jurisdiction based on Defendants' minimum contacts with Florida and with the United States.

52.    Venue is proper in this District under 15 U.S.C. §§ 15 and 22 and 26 U.S.C. § 1391(b), (c), and (d) because, during the Class Period, one or more Defendants resided, transacted business, were found, or had agents in this District, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

18

## IV.    FACTUAL ALLEGATIONS

### A.    Stone Crabs and Spiny Lobsters

53.    Stone crab (Florida stone crab *Menippe mercenaria* and the Gulf stone crab *M. adina*) have "reflected and forced the larger Edenic narrative that helped to create, promote, and transform the physical landscape of Florida."[34] The stone crab fishery is unique to Florida[35] where "[n]early all commercially landed stone crabs are landed." Although the species "has limited availability outside of the southeastern US and Gulf coast and is considered a minor species in the national crab market,"[36] it is "an important species locally"[37] and "an integral part of the Florida economy."[38] Stone crabs can be found on both the Atlantic and Gulf coasts, ranging from North Carolina to Belize; however, the Florida stone crab fishery accounts for approximately 99% of all stone crab landings in the United States.[39] The "stone crab fishery is unique in that only the claws are harvested and the crabs are returned to the water."[40] Returning the crabs back into the water preserves their value to the fishery, as they can regenerate claws that may later be harvested again and continue spawning until natural mortality.[41] Only claws of a minimum size (2 7/8 inches or longer) may be taken, and harvesters must remove the claw carefully at just the right joint so the crab can regenerate it—a process that takes about 18 months.[42] Immediately after harvest, the claws are cooked in boiling water either on the boat or dockside to prevent the meat from sticking

---

[34] Mink, Nicolaas. *Eating the Claws of Eden: Stone Crabs, Tourism, and the Taste of Conservation in Florida and Beyond*, The Florida Historical Quarterly, vol. 86, no. 4, 2008, pgs. 470–97, 471.
[35] Liam Kehoe, Frank Asche, Claire Crowley, Ryan Gandy, David Chagaris, *Costly crustaceans: A hedonic price analysis of the Florida stone crab*, Fisheries Research, Volume 258, 2023, pg. 1.
[36] *Stone Crab*, Monterrey Bay Aquarium Seafood Watch, September 4, 2019.
[37] *Id*.
[38] https://myfwc.com/research/saltwater/crustaceans/stone-crabs/about/
[39] *Id*.
[40] *Id*.
[41] Hancock, Eric R., and Blaine D. Griffen, *Energetic Consequences of Temperature and Sequential Autotomization for the Stone Crab, Menippe Spp*, Marine Ecology Progress Series, vol. 582, 2017, pgs. 133–46, 134.
[42] https://www.fdacs.gov/Consumer-Resources/Buy-Fresh-From-Florida/Seafood-Products/Stone-Crab

to the shell, preserving its market value.[43] The result is a premium, perishable product highly sought by restaurants and consumers for its "sweet meat" and delicate texture.[44]

54.     Spiny lobsters (*Panulirus argus*) are likewise a uniquely valuable Florida species harvested under strict regulation.[45] They inhabit tropical and subtropical waters of the Atlantic Ocean, Caribbean Sea, and the Gulf[46] but are "primarily harvested in Florida's southernmost counties, Monroe and Dade, both in Atlantic waters and the Gulf of Mexico."[47] Spiny lobsters are characterized by numerous sharp spines covering the body,[48] "long, horn-like antennae over their eyes that they wave to scare off predators, and smaller antennae-like 'antennules' that sense movement and detect chemicals in the water."[49] They are highly migratory: during seasonal movements, lobsters form a single line called a "march" and travel from shallow to deeper water.[50] Fishermen often take advantage of this social,[51] aggregating behavior: optimal catches of the spiny lobster "are obtained in traps 'baited' with live, sub-adult lobsters (a legal practice), which attract the highly social adults."[52] It takes a spiny lobster about two years to grow to the three-inch

---

[43] *Id*.

[44] *Id*.

[45] https://www.fisheries.noaa.gov/species/caribbean-spiny-lobster; Ehrhardt, Nelson, et al., *Implications of the Ecosystem Approach to Fisheries Management in Large Ecosystems: The Case of the Caribbean Spiny Lobster*, Towards Marine Ecosystem-Based Management in the Wider Caribbean, edited by Lucia Fanning et al., Amsterdam University Press, 2011, pp. 157–76, 168 ("Florida has a number of well-enforced size and effort regulations in place, including a limit on the number of traps used in the fishery and a trap reduction programme . . . .")

[46] https://myfwc.com/research/saltwater/crustaceans/lobster/facts/

[47] Stafford, Tess M., *What Do Fishermen Tell Us That Taxi Drivers Do Not? An Empirical Investigation of Labor Supply*, Journal of Labor Economics, vol. 33, no. 3, 2015, pp. 683–710, 688.

[48] https://www.fdacs.gov/Consumer-Resources/Buy-Fresh-From-Florida/Seafood-Products/Spiny-Lobster

[49] https://www.fisheries.noaa.gov/species/caribbean-spiny-lobster

[50] https://www.fdacs.gov/Consumer-Resources/Buy-Fresh-From-Florida/Seafood-Products/Spiny-Lobster

[51] Taryn Garlock, Frank Asche, Casey B. Butler, Thomas R. Matthews, Erica Ross, *Price variation in the Caribbean spiny lobster fishery: Incentives for ongrowing wild-caught lobsters in Florida*, Fisheries Research, Volume 273, 2024, pg. 5.

[52] Butler, Mark J., *Collecting and Processing Lobsters*, Journal of Crustacean Biology, vol. 37, no. 3, 2017, pp. 340–46, 341.

carapace legal-harvesting size, and mature specimens can grow as large as 15 pounds.[53] Unlike their northern cousins, spiny lobsters have no claws, and their commercial value lies primarily in the tail meat.[54] Quality is judged by shell color and texture, live condition, mild aroma, firm flesh, and tightly adhering shell.[55]

### B.     Overview of the Stone Crab and Spiny Lobster Market

55.     The relevant products are stone crab claws and spiny lobsters (the "Relevant Products"). Defendants are wholesale buyers who are often referred to in the industry as "fish houses." Defendants purchase their supply of stone crab claws and spiny lobsters from fishermen who harvest them in various Florida locations, including the Gulf and the Florida Keys.[56] Fish houses serve as the primary point of sale where fishermen bring their daily catch for purchase. Fishermen typically receive payment by check on a daily or near-daily basis. These Defendants are horizontal competitors and theoretically should have competed with each other in purchasing stone crab claws and spiny lobsters from fishermen in Florida during the Class Period.

56.     After landing their harvests, fishermen typically negotiate price and quantity with buyers, including Defendants, and sell to those buyers willing to pay the most.[57] These transactions occur at or near the time of landing because the Relevant Products are highly perishable and require prompt handling and sale.[58]

57.     These sales are documented through ex-vessel data reported in the state's Marine Fisheries Information System, commonly known as the "trip ticket" program.[59] Trip tickets are completed at the point of original sale—generally when fishermen deliver their catch to fish

---

[53] https://myfwc.com/research/saltwater/crustaceans/lobster/facts/
[54] https://www.fdacs.gov/Consumer-Resources/Buy-Fresh-From-Florida/Seafood-Products/Spiny-Lobster
[55] *Id.*
[56] *See, e.g.*, *United States of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA, ¶ 3 (Sep. 10, 2025) Dkt No. 1.
[57] *Id.* ¶ 4.
[58] https://www.globalseafood.org/blog/seafood-processing-plant/
[59] Taryn Garlock, Frank Asche, Casey B. Butler, Thomas R. Matthews, Erica Ross, *Price variation in the Caribbean spiny lobster fishery: Incentives for ongrowing wild-caught lobsters in Florida*, Fisheries Research, Volume 273, 2024, pg. 6.

houses.[60] Stone crabs undergo a grading process that "sorts claws by size and assigns a grade (Light, Small, Medium, Large, Jumbo, Colossal), and a price is given per pound of each grade by the fish house or wholesale dealer."[61] As to spiny lobsters, a price per pound is set by the fish house and may differ depending on product grade: live, whole, or unknown.[62] Spiny lobsters suitable for the lucrative live export market command higher live prices, while lobsters in molting condition, injured (*e.g.*, with more than three missing appendages), or otherwise unsuitable for live export are typically sold at the lower whole price.[63]

58.    Defendants and their co-conspirators have a strong hold on the market for spiny lobsters and stone crabs in the Florida Keys and Everglades City, which serves as a major hub for catch from the west coast of Florida.

59.    Florida is the nation's leading source of stone crab claws and spiny lobsters. In 2023, fishermen in Florida landed $42.6 million worth of spiny lobster and $41.9 million worth of stone crab, together accounting for more than 40% of the total value of all Florida commercial seafood landings.[64] These fisheries support thousands of jobs and are vital to the economies of coastal communities from Key West and the Florida Keys through Fort Myers and Tampa Bay, up the Atlantic coast to Mayport and Cape Canaveral.[65] They generate hundreds of millions of dollars in annual economic impact.[66]

---

[60] *Id.*

[61] Liam Kehoe et al., *Costly crustaceans: A hedonic price analysis of the Florida stone crab*, Fisheries Research, Volume 258, 2023, pg. 2.

[62] Taryn Garlock et al., *Price variation in the Caribbean spiny lobster fishery: Incentives for ongrowing wild-caught lobsters in Florida*, Fisheries Research, Volume 273, 2024, pg. 6.

[63] *Id.*

[64] FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES Division of Marketing and Development, *Florida Seafood and Aquaculture Overview and Statistics*, December 2, 2024.

[65] *Id.*

[66] *Id.*



FIGURE 2
Share of stone crab landings by county in Florida from the 2009/2010–2019/2020 fishing year.
Grey indicates no reported landings.



Source: Liam Kehoe et al., *Costly crustaceans: A hedonic price analysis of the Florida
stone crab*, Fisheries Research, Volume 258, 2023, pg. 3.

60.     Once sold to Defendants, Co-Conspirators, and unnamed co-conspirators, and other
purchasers, the Relevant Products enter seafood processing centers, where they are washed,
chilled, graded, packed, and stored before being sold to restaurants, wholesalers, and other
customers throughout the United States and internationally.[67] "[A] substantial share of the seafood
produced in Florida is exported out of state and out of the country."[68] The spiny lobster fishery is
particularly illustrative of this recent trend, having shifted "from supplying frozen tails in the

---

[67] https://www.globalseafood.org/blog/seafood-processing-plant/
[68] Lorenzen, Kai et al., *Climate Change Impacts on Florida's Fisheries and Aquaculture Sectors
and Options for Adaptation*, Florida State University, 2017, pg. 429.

domestic chain restaurant market to live exports, primarily to China."[69] The Florida Keys Commercial Fishermen's Association estimates some 70% to 80% of the harvested spiny lobster in Florida is exported to China[70] where they can be shipped out of Miami and arrive—alive—in Chinese markets in as little as 40 hours.[71]

61.     As a result, the Florida spiny lobster industry is heavily reliant on Chinese consumers.[72] When Chinese buyers first entered the market between 2010 and 2011, their competitive purchasing drove spiny lobster prices as high as $24 per pound.[73] This boom was described as a "bonanza" for the Florida Keys industry in 2014, when prices were around $18 per pound—a market reality lamented by Defendant Gary Graves, of Defendant Keys Fisheries, who publicly complained that the new competition was making it difficult for his business.[74] More recently, in 2017, dockside prices reached a high of nearly $20.50 per pound, demonstrating that a competitive market can sustain significantly higher prices than those paid during the Class Period.[75]

## C.     Defendants' Price-Fixing Conspiracy

62.     Beginning no later than June 2017 and continuing through at least April 2025, Defendants knowingly entered into and participated in a continuing agreement, understanding, and concert of action to suppress and eliminate competition by fixing, stabilizing, and maintaining the prices paid to fishermen for stone crab claws and spiny lobsters (the "Conspiracy").[76]

---

[69] Taryn Garlock et al., *Price variation in the Caribbean spiny lobster fishery: Incentives for ongrowing wild-caught lobsters in Florida*, Fisheries Research, Volume 273, 2024, pg. 3.
[70] https://www.local10.com/news/local/2025/04/23/florida-keys-lobster-industry-reliant-on-chinese-consumers-braces-for-potential-tariff-impact/
[71] https://www.nytimes.com/2020/03/06/business/economy/lobster-florida-china-virus.html
[72] https://www.local10.com/news/local/2025/04/23/florida-keys-lobster-industry-reliant-on-chinese-consumers-braces-for-potential-tariff-impact/
[73] https://www.cbsnews.com/miami/news/cbs4-special-preview-the-business-of-lobster/
[74] https://www.miamitodaynews.com/2014/10/29/tale-lobsters-china-trade/
[75] https://www.nationalfisherman.com/gulf-south-atlantic/spiny-lobster-exports-asia-remain-steady
[76] *See* Information, *United States of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA (Sep. 10, 2025) Dkt No. 1; Plea Agreement, *United States of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA (Sep. 16, 2025) Dkt No. 9.

63.     The purpose of the Conspiracy was to depress the prices paid to fishermen below competitive levels, thereby increasing Defendants' profit margins on the resale of the Relevant Products.[77] The Conspiracy was a per se unlawful restraint of trade under Section 1 of the Sherman Act.[78]

64.     Key individuals at the Defendant corporations, including without limitation Defendant Gary Graves of Keys Fisheries, Defendant Dennis Dopico, Mario Robin Dopico, and George Teruel of D&D, played a central role in organizing and enforcing this conspiracy. On information and belief, the conspirators would meet at Keys Fisheries or local restaurants before the beginning of the lobster and stone crab seasons to agree upon the price they would offer fishermen. They then maintained this agreement through ongoing communications to coordinate price adjustments throughout the season.

65.     The United States alleged—and Vice President of D&D, Dennis Dopico, admitted in his plea agreement—that D&D and Keys Fisheries engaged in a price-fixing conspiracy and implemented that price-fixing agreement through a series of coordinated meetings, calls, and text message exchanges with competitors in which participants agreed upon the prices to be paid to fishermen for stone crab claws and spiny lobsters.[79]

66.     Indeed, Defendant Dopico and his co-Defendants routinely exchanged text messages and calls in which they coordinated and agreed on the prices they would pay fishermen and would adjust the prices together as the respective harvest seasons progressed. Illustrative examples of exchanges are as follows:

67.     On or about September 28, 2023, Dopico texted a competitor the per-pound prices that D&D was paying for spiny lobster.[80] The executive responded, "ok thanks." And Dopico

---

[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] Information, No. 1:25-cr-20393-CMA, ¶ 15; Plea Agreement, No. 1:25-cr-20393-CMA, ¶ 6(c).

replied: "Don't show text to anyone[.] Confidential[.]"[81] The competitor responded: "I give you my word. We're working together now[,] not against each other[.]"[82]   Upon information and belief, this language reflects the reaffirmation of the long-standing conspiracy to ensure continued adherence to the scheme.

68.     Two weeks later, on or about October 13, 2023, the same competitor texted Dopico their company's stone crab claw prices.[83] Dopico responded: "Let me know what you do. I am matching your prices. It's the one we like the most[.]"[84] D&D then adjusted its purchasing prices to match those of the competitor, thereby implementing the agreement.[85]

69.     These illustrative communications are not merely parallel behavior or exchanges of market gossip—they reflect an express commitment to coordinate prices and maintain solidarity among competitors. The language used ("we're working together now," "I am matching your prices") demonstrates that Defendants were acting pursuant to an anticompetitive agreement rather than independent business judgment.

70.     On information and belief, the conspirators' tactics extended beyond price coordination. They actively worked to eliminate competitors who refused to join the conspiracy. In at least one instance, an intermediary fish house that offered higher prices to fishermen was "black-balled" by the conspirators, who agreed not to buy any product from that fish house. The conspirators also targeted this competitor by frequently filing frivolous claims with law enforcement to impede its operations, ultimately driving it out of business.

71.     Furthermore, on information and belief, when Chinese buyers entered the market and began competing on price, the conspirators sought to neutralize them by filing complaints with law enforcement against them, prompting frequent raids and inspections designed to disrupt their business and bring them into alignment with their conspirators' pricing.

---

[81] *Id.*
[82] *Id.*
[83] *Id.* at ¶ 15; *Id.* at ¶ 6(c).
[84] *Id.*
[85] Plea Agreement, No. 1:25-cr-20393-CMA, ¶ 6(c).

72.     On information and belief, Defendants employed additional anticompetitive tactics by enforcing a "blacklist" against fishermen who sought higher prices for their product. Specifically, on information and belief, certain fishermen attempted to secure prices above those offered by Keys Fisheries and D&D. When Gary Graves of Keys Fisheries, Dennis Dopico of D&D, and an individual at co-conspirator AIFA, learned of these efforts, they "blacklisted" those fishermen and instructed their co-conspirators not to purchase product from them. As a result, on information and belief, those fishermen were effectively excluded from the market and forced to sell their catch at steeply discounted prices far below the value of 'live' grade lobsters sold into restaurant, export, or retail markets.

73.     Unbeknownst to the fishermen, who attempted to negotiate for the best price,[86] Defendants carried out the Conspiracy as follows:

A.  Participated in meetings, conversations, and communications regarding the prices to be paid to fishermen for their harvested stone crab claws and spiny lobsters;

B.  Agreed during various meetings, conversations, and communications to depress, fix, stabilize, and maintain prices for stone crab claws and spiny lobsters purchased from fishermen;

C.  Discussed and exchanged pricing information for stone crab claws and spiny lobsters for the purpose of carrying out the agreement;

D.  Implemented fixed and depressed prices for stone crab claws and spiny lobsters in accordance with the agreement reached;

E.  Communicated with one another to confirm that they had in fact notified fishermen of the fixed and depressed prices; and

F.  Paid fishermen for stone crab claws and spiny lobsters at collusive, noncompetitive prices.[87]

74.     Dopico's Plea Agreement also establishes D&D's purchases of stone crab claws and spiny lobsters affecting fishermen in Florida totaled approximately $8 million between July

---

[86] *Id*.
[87] *Id*.

2023 and April 2025.[88] Given that at least five co-conspirator firms participated in the unlawful scheme, the total commerce subject to artificially suppressed prices during this period is conservatively estimated to be around $40 million on an annualized basis. This figure from a single conspirator represents a substantial portion of the total annual dockside value for the Relevant Products.[89] Discovery will reveal the full scope of the Conspiracy across all Defendants and the entire Class Period, which Plaintiffs believe involves a volume of commerce exceeding $300 million. Plaintiffs and Class members thus suffered tens of millions of dollars in aggregate economic harm.

75.     After agreeing on price levels, Defendants implemented those prices at their purchasing locations statewide.[90] They informed fishermen of the agreed-upon prices and paid for harvests at those suppressed levels.[91] They also monitored one another's adherence to the agreed prices through follow-up communications, adjusting prices in tandem as the harvest season progressed to ensure no competitor deviated from the agreed-upon suppressed prices.[92]

76.     These coordinated actions eliminated competitive price discovery, ensured that fishermen faced a uniform cartel price regardless of where they landed their catch, and directly reduced fishermen's revenues. The harm from these suppressed prices is severe, with fishermen reporting that prices as low as $5 per pound for lobster are driving them out of business.[93] The Conspiracy was not speculative, tacit, or inferred from market behavior; it was openly acknowledged in contemporaneous communications and confirmed by a guilty plea in federal court.[94]

---

[88] Plea Agreement, No. 1:25-cr-20393-CMA, ¶ 6(a).
[89] https://myfwc.com/conservation/value/saltwater-fishing/
[90] Information, No. 1:25-cr-20393-CMA, ¶ 14(d).
[91] *Id*. at ¶ 14(e).
[92] *Id*. at ¶¶ 14(a), (b), (c).
[93] https://www.facebook.com/reel/3635836803376610
[94] *See* Plea Agreement, *United States of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA (Sep. 16, 2025) Dkt No. 9.

**D.    Collusion Was Enabled by Market Structure and Characteristics**

**1.    Growing Market Concentration**

77.    The Relevant Market for purchasing stone crab claws and spiny lobsters in Florida reflects growing concentration on the buyer side. In the past, the market included intermediary fish houses that would buy from fishermen and sell to large wholesalers, adding a layer of competition to the procurement process. Over time, these intermediaries have largely disappeared. By approximately 2012 the state had 347 seafood processing plants in operation.[95] Less than a decade later, by 2021, that number had dropped to just 36 seafood processing businesses, underscoring the extent of consolidation in the industry.[96] This dramatic contraction has left procurement of the Relevant Products dominated by a relatively small group of processors and wholesalers. The market power of these few dominant wholesalers is immense; a single large fish house can intake between 25,000 and 50,000 pounds of product per day. These firms serve as essential gateways between fishermen and downstream markets. As a result, collusion among a handful of dominant buyers has immediate and far-reaching effects on dockside prices statewide.

**2.    Consolidation Trends and Anticompetitive Risks**

78.    The seafood industry has undergone accelerating consolidation, particularly in processing and distribution.[97] In 2024 alone, more than 75 mergers, acquisitions, and investment deals were completed globally, with seafood processors and distributors identified as key sectors for deal-making.[98] The first half of 2025 continued this trajectory, as wholesalers and private equity firms acquired processing assets in order to achieve scale, vertical integration, and efficiency

---

[95] FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES Division of Marketing and Development, *Florida Seafood and Aquaculture Overview and Statistics*, 2014; *see also* https://www.volusia.org/core/fileparse.php/5822/urlt/AllPrograms.pdf

[96] *Alaska Seafood Overview of the Global Supply Chain*, McKinley Research Group, LLC, March 2023, Pg. 70, https://www.alaskaseafood.org/wp-content/uploads/Alaska-Seafood-Supply-Chains-Overview-March-2023-Final.pdf

[97] See *Future of Fish. Making Sense of Wild Seafood Supply Chains*, The Nature Conservancy, 2015, Pg. 12 "ATTRIBUTE 4 Supply Chain Consolidation (Vertically Integrated Vs. Dispersed)"

[98] Brad Bodenman, Matt Latimer and Zack Hsieh, *Seafood Industry Update 2024*, ACT Capital Advisors, https://www.actcapitaladvisors.com/wp-content/uploads/2024-Seafood-Report-1.pdf

gains.[99] Analysts forecast that this consolidation momentum will intensify through 2025 and beyond.[100]

79.     The industry has also seen widening disparities between global giants and smaller processors, driving joint ventures and expansions by larger companies that further concentrate purchasing power.[101] In this environment, a handful of dominant buyers can exert disproportionate influence over prices, and coordinated purchasing decisions have amplified effects on fishermen's revenues and statewide price discovery.

### 3.     Barriers to Entry

80.     Entry into seafood processing and wholesale distribution is subject to high structural barriers.[102] New firms must build costly infrastructure to handle perishable catch, including chilling, storage, grading, packing, and cold-chain logistics.[103] Operators must also comply with strict regulatory standards for food safety and export certification.[104] Because stone crab and spiny lobster spoil quickly if not processed immediately,[105] harvesters cannot bypass

---

[99] Brad Bodenman, Matt Latimer and Zack Hsieh, *Seafood Industry Update H-1 2025*, ACT Capital Advisors, https://www.actcapitaladvisors.com/wp-content/uploads/H1-2025-Seafood-Report.pdf

[100] *Id.*

[101] *See Seafood Industry Update H-1 2024*, ACT Capital Advisors, https://www.actcapitaladvisors.com/wp-content/uploads/Seafood-Industry-Update-H1-2024.pdf

[102] *See Future of Fish. Making Sense of Wild Seafood Supply Chains*, The Nature Conservancy, 2015, Pg. 13 "ATTRIBUTE 5 Market Access (Bottleneck Vs. Open Access); Chris Chase, *US seafood workforce at inflection point as barriers prevent new entrants*, Seafood Source, Apr. 14, 2025 https://www.seafoodsource.com/news/supply-trade/us-seafood-industry-workforce-at-inflection-point-as-barriers-prevent-new-entrants ("Things like fuel, ice, and processing facilities fishermen sell their catch to are all important – and are also increasingly scarce in certain communities as working waterfronts disappear and expensive tourist-oriented businesses move in.")

[103] *See* https://www.globalseafood.org/blog/seafood-processing-plant/; https://www.bluecart.com/blog/wholesale-seafood-industry ("The perishable nature of fish and shellfish makes it very unstable and spoilage-prone.")

[104] *See* https://www.fdacs.gov/Business-Services/Food/Food-Establishments/Wholesale-Manufactured-Food-Program/Seafood-HACCP

[105] *See* https://www.fdacs.gov/Consumer-Resources/Buy-Fresh-From-Florida/Seafood-Products/Stone-Crab; https://www.fdacs.gov/Consumer-Resources/Buy-Fresh-From-Florida/Seafood-Products/Spiny-Lobster

established buyers, giving incumbent processors durable market power and further reducing the threat of new competitive entry. Furthermore, new entrants face significant commercial barriers, including the difficulty of persuading fishermen—who are often financially dependent on or fear retribution from the established cartel members—to switch buyers, further reducing the threat of new competitive entry.

### 4.   *Motivation to Collude*

81.    For decades, companies purchasing Florida stone crab claws and spiny lobsters operated with little outside pressure, allowing entrenched wholesalers and processors (like Defendants) to maintain depressed dockside prices without meaningful competitive challenge or scrutiny.

82.    That stability was disrupted beginning around 2010, when surging demand from China for Florida spiny lobster introduced new buyers willing to pay premium prices to secure supply for export.[106] These higher offers threatened the long-standing margins and market control of established Florida buyers like Defendants. Facing the prospect of losing access to product or paying significantly more for fishermen's' harvests, Defendants and their co-conspirators coordinated to blunt the impact of foreign demand—acting to preserve their ability to dictate and suppress dockside prices despite growing global willingness to pay. In some instances, this coordination extended to colluding with foreign-associated companies themselves in order to neutralize their disruptive effect on local dockside pricing.

83.    This desire to control prices and protect profit margins from free-market volatility is the core motive for the conspiracy. Defendant Gary Graves, a key player in the scheme, openly expressed this sentiment. Faced with high market prices resulting from low supply, Graves lamented the conditions, stating a preference for "really good volume with reasonable prices."[107]

---

[106] *See* https://www.miamiherald.com/news/local/community/florida-keys/article228822799.html; https://www.nytimes.com/2020/03/06/business/economy/lobster-florida-china-virus.html

[107] https://www.gainesville.com/story/news/2013/10/14/florida-s-stone-crab-season/31854501007/

From a buyer's perspective, "reasonable prices" are stable, predictable, and artificially low—the exact outcome of a price-fixing agreement. This statement is a direct admission that Defendants viewed competitive, high prices as a threat to their business, providing a clear motive to collude and suppress the prices paid to fishermen.

### 5.    *Fragmented and Vulnerable Seller Market*

84.    By contrast, the seller side of the Relevant Market—Florida's commercial fishermen—is fragmented, small-scale, and geographically dispersed across both Gulf and Atlantic coasts. During the 2019/20 fiscal year, Florida issued 9,700 Saltwater Products Licenses to individual commercial fishermen,[108] highlighting the highly fragmented nature of the supply side.[109] Most fishermen land modest quantities and must sell quickly to prevent spoilage.[110]

85.    The financial position of fishermen is precarious, magnifying the coercive power of Defendants' conspiracy. On information and belief, the fisheries are highly intertwined, as a substantial majority—estimated at 90%—of spiny lobster fishermen also fish for stone crabs. The seasonal nature of each fishery creates significant income gaps that leave fishermen vulnerable. For example, by the time the stone crab season opens in mid-October, fishermen have not received income from that specific fishery for six months. This recurring lack of product-specific income leaves them with extremely low bargaining power at the start of each season, making them dependent on the prices offered by Defendants.

86.    On information and belief, some of the conspirator fish houses have exploited this vulnerability by lending money to fishermen at high interest rates to get them through the

---

[108] https://myfwc.com/conservation/value/saltwater-fishing/; See Stafford, Tess M., *What Do Fishermen Tell Us That Taxi Drivers Do Not? An Empirical Investigation of Labor Supply*, 2015, pg. 688 ("All commercial fishermen must possess a valid saltwater products license in order to catch and sell lobsters.")

[109] *See* Stafford, Tess M., pg. 688 ("Very few individuals own more than one license, and virtually all license holders operate their own vessel. Therefore, a license, vessel, or captain reasonably identifies the same unit.")

[110] *See* https://www.fdacs.gov/Consumer-Resources/Buy-Fresh-From-Florida/Seafood-Products/Stone-Crab; https://www.fdacs.gov/Consumer-Resources/Buy-Fresh-From-Florida/Seafood-Products/Spiny-Lobster

offseason, then docking a portion of the price paid for their catch to repay the loan plus interest. This dependency is further entrenched by the fact that fishermen frequently rely on the fish houses to store their traps during the off season and for dockage of their boats. Many fishermen fear retribution, such as the confiscation of their traps, if they challenge the prices offered by the fish houses.

87.     On information and belief, the opening price for the season is kept secret until fishermen have already laid their traps, preventing them from making an informed decision about whether fishing at the offered price is economically viable.

88.     This historical context of exploitation is exemplified by the October 2013 fishermen's strike, which protested unsustainably low prices offered by Joe's Stone Crab—an enterprise affiliated with two named Defendants. The strike, prompted by prices fishermen said they could not work for, underscores the long-standing power imbalance between the fragmented fishing fleet and the concentrated group of buyers, including the Defendants' affiliates.[111]

89.     This fragmentation leaves harvesters with little bargaining leverage and makes them highly dependent on immediate dockside offers. The asymmetry between entrenched, concentrated, financially powerful buyers and fragmented, indebted, and economically vulnerable sellers magnifies the effectiveness of collusion among buyers.

### 6.     *Standardization of Products*

90.     Stone crab claws and spiny lobsters are standardized commodity products. Stone crab claws are sold by size grades (medium, large, jumbo, colossal),[112] while lobsters are sold by weight and carapace length.[113] Within these categories, products are largely fungible and priced

---

[111] https://www.seafoodsource.com/news/supply-trade/fla-crabbers-strike-over-low-prices; https://www.miamiherald.com/latest-news/article1956332.html
[112] https://captainstonecrab.com/blogs/news/stone-crab-claw-sizing-guide-choosing-between-medium-large-jumbo-colossal-stone-crab-claws?srsltid=AfmBOopXt5rJh8r39HH36-X9jWZVuENw7Izrsf3dE3n5lwPx4DpptOBU
[113] https://www.newpelican.com/articles/catching-the-ocean-view-measuring-spiny-lobsters-in-florida/

by the pound. This uniformity allows competitors, including Defendants, to exchange precise pricing information and to coordinate easily on standardized price points.[114]

### 7.      *Opportunities for Coordination*

91.      The procurement process provides frequent opportunities for coordination. Fishermen land their catch at docks and negotiate price and quantity on site.[115] Buyers operate in close social and geographic proximity, post dockside prices openly, and frequently communicate with one another both in person and by phone and text message. Dopico's Plea Agreement confirms that Defendants used direct text messages to align offers—for example, "[l]et me know what you do. I am matching your prices. It's the one we like the most[.]"[116] These conditions of transparency and repeated interaction make collusion easier to initiate, monitor, and sustain.

### 8.      *Demand Inelasticity and Lack of Substitutes*

92.      Demand for the Relevant Products is inelastic and seasonal. Stone crab and spiny lobster are unique delicacies with no close substitutes in Florida.

93.      Stone crabs are unique primarily because they can regenerate their claws after a sustainable harvesting practice. The clawless Caribbean spiny lobsters caught off Florida's coasts are especially prized in China, where they are considered more desirable than American clawed Lobster and command premium prices in that export market.[117]

### E.      **Anticompetitive Effects and Harm to Competition**

94.      Defendants' collusive agreement produced clear and measurable anticompetitive effects: the suppression of dockside prices, the elimination of competition among buyers, and widespread economic harm to Florida's fishermen and coastal communities.

---

[114] *See* Information, *United States of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA (Sep. 10, 2025) Dkt No. 1.
[115] *Id.*
[116] *Id.*
[117] https://www.nytimes.com/2020/03/06/business/economy/lobster-florida-china-virus.html

### 1.      Suppression of Fishermen's Prices

95.      Defendants' agreement and concerted conduct had the intended and actual effect of suppressing the prices paid to Florida fishermen for stone crab claws and spiny lobsters below competitive levels. As a direct result of the Conspiracy, fishermen received materially less for their harvests than they would have in a competitive market.[118]

96.      Participating buyers implemented collusive prices simultaneously at multiple Florida landing points, ensuring that fishermen faced a uniform price regardless of where they landed their catch. This eliminated the ability of fishermen to negotiate for the best price and effectively removed competition from the procurement market.[119]

### 2.      Volume of Commerce Affected

97.      The Conspiracy impacted a substantial volume of commerce. According to Dopico's Plea Agreement, D&D had approximately $8 million in purchases of stone crab claws and spiny lobsters tied to the charged conduct in the past two years.[120] Plaintiffs believe the length of the Conspiracy was at least eleven years and the relevant commerce exceeds $300 million. This figure represents a sizable share of the Florida market for the Relevant Products and confirms that the Conspiracy materially distorted competitive outcomes.

### 3.      Seasonal Concentration of Harm

98.      The harm was magnified by the seasonal concentration of stone crab and spiny lobster harvests, as illustrated by the following chart.[121] More than 55% of Florida's annual seafood value is landed between October and February.  Because the products are perishable,

---

[118] *See* Information, *United States of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA (Sep. 10, 2025) Dkt No. 1.

[119] *See* Information, *United States of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA (Sep. 10, 2025) Dkt No. 1.

[120] *See* Plea Agreement, *United States of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA (Sep. 16, 2025) Dkt No. 9.

[121] Liam Kehoe et al., *Costly crustaceans: A hedonic price analysis of the Florida stone crab*, Fisheries Research, Volume 258, 2023, pg. 2 ("The stone crab fishery is highly seasonal"); Taryn Garlock et al., *Price variation in the Caribbean spiny lobster fishery: Incentives for ongrowing wild-caught lobsters in Florida*, Fisheries Research, Volume 273, 2024, pg. 5 ("There is strong seasonality in the landings of spiny lobster")

fishermen cannot delay sales in search of better prices, nor can consumers or restaurants readily switch to alternatives. By fixing prices during these peak months, Defendants deprived fishermen of income during the period that determines their annual earnings. Because the products are perishable, fishermen cannot delay sales in search of better prices, leaving them vulnerable to cartel prices.

FIGURE 3



Source: *Florida Seafood and Aquaculture Overview and Statistics*, FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES Division of Marketing and Development, December 2, 2024, pg. 13.

### 4.    *Downstream and Community Impact*

99.    Defendants continued to sell the Relevant Products at prevailing market rates despite purchasing them at suppressed prices from fishermen. Consequently, Defendants' scheme had downstream effects that rippled through the seafood supply chain. By paying suppressed prices to fishermen while continuing to sell product at prevailing market rates, Defendants artificially widened their profit margins. Restaurants and retailers, who continued to pay competitive wholesale prices, bore higher input costs, and consumers ultimately faced elevated menu prices and reduced product availability. As the U.S. Attorney's Office for the Southern District of Florida

explained, "[p]rice fixing cheats fishermen, squeezes restaurants, and makes families pay more at the table."[122]

### 5.    Lack of Legitimate Business Justification

100.    The conduct alleged herein constitutes a per se violation of Section 1 of the Sherman Act.[123] Plaintiffs and members of the Class suffered antitrust injury in the form of reduced dockside prices, lost income, and diminished opportunities to benefit from competition in the Relevant Market.

## V.    STATUTES OF LIMITATIONS

101.    Plaintiffs' and the class members' claims are not barred by any applicable statute of limitations. Plaintiffs were, in fact, unaware of Defendants' price-fixing scheme until September 2025. The Conspiracy was self-concealing and actively concealed by Defendants, who engaged in clandestine communications to coordinate suppressed dockside prices.

102.    The scope, extent, and nature of Defendants' anticompetitive conduct was unknown to Plaintiffs until the filing of the criminal Information and the entry of the Plea Agreement in September 2025, which disclosed for the first time the Conspiracy and the facts underlying it.[124] Without those disclosures, Plaintiffs could not have learned of the price-fixing Conspiracy, identified who was responsible for coordinating dockside prices, or understood the mechanisms by which the Conspiracy operated.

103.    In addition, Defendants conducted their collusive communications through private channels, including text messages and calls between competitors, rather than through transparent

---

[122] *Executive of Miami-Based Seafood Wholesale Company Pleads Guilty to Price-Fixing Conspiracy*, Office of Public Affairs U.S. Department of Justice, Sep. 16, 2025, https://www.justice.gov/opa/pr/executive-miami-based-seafood-wholesale-company-pleads-guilty-price-fixing-conspiracy

[123] *See* Information, *Unites Stated of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA (Sep. 10, 2025) Dkt No. 1; Plea Agreement, *United States of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA (Sep. 16, 2025) Dkt No. 9.

[124] *See* Information, *United States of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA (Sep. 10, 2025) Dkt No. 1; Plea Agreement, *United States of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA (Sep. 16, 2025) Dkt No. 9.

or public means. As reflected in the criminal filings, Defendants used direct messages to confirm and align dockside pricing—conduct that by its nature is not observable to fishermen or the public.[125]

104.    As a result, the anticompetitive conduct alleged herein was self-concealing, and Plaintiffs could not have discovered it through the exercise of reasonable diligence prior to the public disclosures made by the Antitrust Division of the United States Department of Justice in September 2025.

## VI.    CLASS ACTION ALLEGATIONS

105.    Plaintiffs bring this action on behalf of themselves, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of all members of the following two classes (together, "Classes"):

> **Damages Class:** All persons and entities who, during the period from June 2017 through April 2025, sold stone crab claws and/or spiny lobsters directly to one or more Defendants or their co-conspirators.
>
> **Injunctive Class**: All persons and entities who, during the period from June 2017 through April 2025, sold stone crab claws and/or spiny lobsters directly to one or more Defendants or their co-conspirators.

106.    Excluded from each of the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, all judges assigned to this matter, all jurors in this matter, and all persons or entities that did not sell stone crab claws or spiny lobsters directly to Defendants or their co-conspirators.

107.    Each of the Classes is so numerous that joinder of all members would be impracticable. While Plaintiffs do not know the exact number of members of each of the Classes, Plaintiffs believe there are thousands of members in each of the Classes.

---

[125] See Information, *United States of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA (Sep. 10, 2025) Dkt No. 1; Plea Agreement, *United States of America v. Dennis Dopico*, No. 1:25-cr-20393-CMA (Sep. 16, 2025) Dkt No. 9.

108.    Common questions of law and fact exist as to all members of each of the Classes. This is particularly true given the nature of Defendants' Conspiracy, which was generally applicable to all members of each of the Classes, thereby making appropriate relief with respect to each Class as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy to fix and maintain the dockside prices of stone crab claws and spiny lobsters purchased from fishermen;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether Defendants' conduct violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

(e)    Whether Defendants' alleged conduct violated Florida antitrust laws;

(f)    Whether the conduct of Defendants and co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(g)    The effect of Defendants' conduct on the dockside prices paid to fishermen during the Class Period; and

(h)    The appropriate relief for the Classes, including injunctive and equitable relief.

109.    Plaintiffs' claims are typical of the claims of the members of the respective Classes Plaintiffs seek to represent, and Plaintiffs will fairly and adequately protect the interests of the respective classes Plaintiffs seek to represent. Plaintiffs and all members of the Classes that Plaintiffs seek to represent were similarly affected by Defendants' wrongful conduct in that they received artificially suppressed prices for stone crab claws and spiny lobsters sold to Defendants and/or their co-conspirators.

110. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of each of the Classes that each Plaintiff seeks to represent. Plaintiffs' interests are coextensive with, and not antagonistic to, those of the other members of the respective Classes that Plaintiffs seek to represent. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and other complex class actions.

111. The questions of law and fact common to the members of each of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

112. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

113. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.  PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY

114. Defendants' antitrust Conspiracy had the following effects, among others:

   (a)  Price competition was restrained and eliminated with respect to the purchase of stone crab claws and spiny lobsters in Florida;

   (b)  The prices paid to fishermen for stone crab claws and spiny lobsters were fixed, suppressed, stabilized, and maintained at artificially depressed levels;

   (c)  Plaintiffs and the Classes received lower prices for their harvests than they would have in a competitive market, as a direct, foreseeable, and proximate result of Defendants' conduct;

(d)     Fishermen were deprived of the benefits of free and open competition, including the ability to negotiate for the best price; and

(e)     Plaintiffs and the Classes suffered reduced revenues and income as a result of Defendants' collusive conduct.

115.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to suppress, stabilize, and/or maintain the prices paid to fishermen for stone crab claws and spiny lobsters at non-competitive levels.

116.    The precise amount of damages sustained by Plaintiffs and the Class can be measured and quantified using accepted methods of economic analysis, including models that compare actual prices paid during the Class Period with the prices that would have prevailed in a competitive market absent the Conspiracy.

117.    By reason of Defendants' violations of the antitrust laws, Plaintiffs and the members of the Class have sustained injury to their businesses and property in the form of artificially suppressed dockside prices for direct sales of stone crab claws and spiny lobsters. This harm constitutes antitrust injury of the type that the federal antitrust laws were intended to prevent and flows directly from Defendants' unlawful Conspiracy.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### 15 U.S.C. § 1

118.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 117 as though fully set forth herein.

119.    From at least June 2017 through April 2025, and continuing until the effects of their unlawful conduct cease, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of interstate trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

120.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to suppress, fix, stabilize, and maintain at artificially depressed levels the dockside prices paid to fishermen for stone crab claws and spiny lobsters.

121.    In formulating and effectuating this Conspiracy, Defendants and their co-conspirators did those things they combined and conspired to do, including:

A.   exchanging competitively sensitive information, including actual and intended dockside purchase prices, in order to align the prices they paid to fishermen;

B.   communicating by text messages, calls, and other private channels to coordinate the prices they would offer for stone crab claws and spiny lobsters;

C.   implementing, adhering to, and policing their collusive agreement by adjusting posted dockside prices in lockstep across multiple Florida landing points; and

D.   engaging in conduct designed to eliminate price competition among themselves and to deprive fishermen of the benefits of competitive bidding.

122.    Defendants and their co-conspirators engaged in the actions described above for the purpose and effect of carrying out their unlawful agreement to suppress, stabilize, and fix the prices paid to fishermen for stone crab claws and spiny lobsters.

123.    Defendants' Conspiracy had the following effects, among others:

A.   Price competition in the market for stone crab claws and spiny lobsters has been restrained, suppressed, and eliminated;

B.   Dockside prices for stone crab claws and spiny lobsters have been fixed and maintained at artificially low, non-competitive levels across Florida; and

C.   Plaintiffs and members of the Classes have been deprived of the benefits of free and open competition, including competitive dockside bidding and fair market prices for their harvests.

124.    Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by receiving less for stone crab claws and spiny lobsters sold

directly to Defendants and their co-conspirators than they would have received in the absence of the Conspiracy.

125.    The alleged contract, combination, or conspiracy is a per se violation of Section 1 of the Sherman Act.

126.    Plaintiffs and members of the Class are entitled to damages, including treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, as well as injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, preventing and restraining further violations of the antitrust laws.

**SECOND CLAIM FOR RELIEF**
**Violation of the Florida Antitrust Act**
**Fla. Stat. §§ 542.15, *et seq.***

127.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 117 as though fully set forth herein.

128.    Under Part I of Chapter 542 (the "Florida Antitrust Act of 1980"), Fla. Stat. §§ 542.15 et seq., every contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful. Fla. Stat. § 542.18.

129.    Defendants entered into and engaged in a combination, conspiracy, or agreement to suppress, fix, stabilize, and maintain dockside prices paid to Florida fishermen for stone crab claws and spiny lobsters, in violation of Fla. Stat. § 542.18.

130.    Defendants' conduct also constitutes a conspiracy in restraint of trade under Fla. Stat. § 542.18 and/or an attempt or conspiracy to monopolize under Fla. Stat. § 542.19.

131.    The actions of Defendants were not exempt under any provision of Chapter 542, and they cannot invoke any statutory exemption to justify their conduct.

132.    Defendants' unlawful conduct substantially and adversely affected trade and commerce in Florida, including the market for the Relevant Products, and had deleterious effects on Florida fishermen, coastal communities, and downstream markets.

133.    As a direct and proximate result of Defendants' violation of Chapter 542, Plaintiffs and members of the Class have been injured in their business or property by reason of receiving suppressed dockside prices for stone crab claws and spiny lobsters, and have sustained damages.

134.    Under Fla. Stat. § 542.22(1), Plaintiffs and members of the Class may recover threefold (treble) the damages sustained, together with costs of suit including reasonable attorneys' fees.

135.    Plaintiffs and members of the Class also seek injunctive and other equitable relief under Fla. Stat. § 542.23, to prevent future violations of Chapter 542.

136.    Plaintiffs and members of the Class are entitled to all other relief the Court deems just and proper under Florida law.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment in Violation of Common Law**

137.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 117 as though fully set forth herein.

138.    Plaintiffs and Class members sold stone crab claws and spiny lobsters during the Class Period directly to Defendants and their co-conspirators. These transactions were supposed to be priced based on competitive market forces and reflect honest competition among Defendants.

139.    However, rather than competing honestly and aggressively with each other, Defendants colluded to fix, suppress, stabilize, and depress the dockside prices paid to Plaintiffs and the Class for the purchase of their harvests.

140.    Defendants' collusion enabled them to enjoy unjust profits and artificially widened margins at the expense of Plaintiffs and the Class, causing Plaintiffs and the Class to receive materially less for the sale of stone crab claws and spiny lobsters than they otherwise would have received had Defendants acted lawfully and fairly.

141.    It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiffs and the Class, and equity and good conscience require Defendants to make restitution.

142.    Plaintiffs and the Class therefore seek restoration of the monies of which they were unfairly and unlawfully deprived as described in this Complaint.

## IX.    PRAYER FOR RELIEF

143.    Plaintiffs, on behalf of themselves and members of the Classes, request relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a) & (b) of the Federal Rules of Civil Procedure, that the Plaintiffs be named as Class Representatives of both Classes, that the undersigned be named as Lead Class Counsel of both Classes, and that the Court direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

B.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal and state laws set forth above;

C.    That the Court award Plaintiffs and members of the Classes damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

D.    That the Court issue appropriate injunctive and other equitable relief against Defendants;

E.    That the Court award Plaintiffs pre- and post-judgment interest;

F.    That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts, as permitted by law; and

G.    That the Court award any and all such other relief as the Court may deem just and proper.

## X.    JURY DEMAND

144.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all matters so triable.

Respectfully submitted,

Dated: October 6, 2025                  */s/ Benjamin J. Widlanski*
Benjamin J. Widlanski (FBN 1010644)
Brandon M. Sadowsky (FBN 1052643)

**KOZYAK TROPIN THROCKMORTON LLP**
2525 Ponce de Leon Boulevard, 9th Floor
Coral Gables, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
bwidlanski@kttlaw.com
bsadowsky@kttlaw.com

Joseph Saveri (*pro hac vice forthcoming*)
Cadio Zirpoli (*pro hac vice forthcoming*)
**JOSEPH SAVERI LAW FIRM**
601 California Street Suite 1505
San Francisco, CA 94108
Tel: (415) 500-6800
Fax: (415) 395-9940
czirpoli@saverilawfirm.com

Adam J. Zapala (*pro hac vice forthcoming*)
Elizabeth T. Castillo (*pro hac vice forthcoming*)
Christopher F. Jeu (*pro hac vice forthcoming*)
Christian S. Ruano (*pro hac vice forthcoming*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
cjeu@cpmlegal.com
cruano@cpmlegal.com

Brandon S. Floch (FBN 125218)
Jeffrey A. Neiman (FBN 544469)
**NEIMAN MAYS FLOCH &
ALMEIDA PLLC**
100 SE 3rd Ave, Suite 805
Fort Lauderdale, FL 33394
Tel: (954) 462-1200
bfloch@nmfalawfirm.com
jneiman@nmfalawfirm.com

*Counsel for Plaintiffs*