**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO.: 25-cv-24603-CMA**

PARADISE TAILS, INC., et al.,

Plaintiffs,

v.

D&D SEAFOOD CORPORATION, et al.,

Defendants.
_________________________/

February 6, 2026

Pages 1 - 25

DISCOVERY HEARING

BEFORE THE HONORABLE LAUREN FLEISCHER LOUIS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

Counsel on behalf of the Plaintiffs:

NEIMAN MAYS FLOCH & ALMEIDA PLLC
100 SE 3rd Avenue,
Suite 805J,
Fort Lauderdale, FL 33394
BY: BRANDON S. FLOCH, ESQ.

APPEARANCES CONTINUED:

Counsel on behalf of the Plaintiffs:

KOZYAK TROPIN & THROCKMORTON, LLP
2525 Ponce de Leon Boulevard
9th Floor,
Coral Gables, FL 33134
BY: BRANDON M. SADOWSKY, ESQ.

Counsel on behalf of Defendant Keys Fisheries:

AKERMAN, SENTERFITT
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100,
Miami, FL 33131
BY: JACQUELINE M. ARANGO, ESQ.
BY: CHRISTOPHER W. BOYETT, JR., ESQ.

Transcribed By:

BONNIE JOY LEWIS, R.P.R.
7001 SW 13 Street
Pembroke Pines, FL 33023
954-985-8875
caselawreporting@gmail.com

(Thereupon, the following proceedings were held:)

THE COURTROOM DEPUTY: All rise.

The United States District Court for the Southern District of Florida is now in session. The Honorable Lauren Louis presiding.

THE COURT: Good afternoon. Please be seated.

THE COURTROOM DEPUTY: Calling Case Number 25-cv-24603-Chief Judge Altonaga; Paradise Tails, Inc., et al., versus D&D Seafood Corporation, et al.

Counsel, would you please announce your appearances for the record beginning with the Plaintiff.

MR. FLOCH: Good afternoon, Your Honor.

For the Plaintiffs, Brandon Floch from Neiman Mays Floch and Almeida and with me to my right is Brandon Sadowsky from Kozyak Tropin and Throckmorton.

THE COURT: Okay. Thank you.

MS. ARANGO: Good afternoon, Your Honor.

Jacqueline Arango and Chris Boyett here on behalf of Keys Fisheries.

THE COURT: Thank you.

Sorry. I just can't break into my own computer.

All right. We looked at the materials that were sent in advance of the hearing.

Miss Arango, has production started?

MS. ARANGO: We have not started production.

I think once we have a protective order in place we can start.

We had a meet and confer that was about an hour and-a-half and we have discussed what sort of low hanging fruit can be produced. Some data that was produced earlier; produced in response to a Grand Jury subpoena.

Just today we have received a draft of the production order that we made some comments to a few weeks ago when we discussed in our meet and confer.

And we agreed to the changes to the protective order and are going to -- we added co-defendant counsel to the e-mail so they can review it. So once that is entered production can begin.

THE COURT: To the extent that Defendant is concerned about the confidentiality of its production, it was incumbent on the Defendant to move for a protective order timely. It is not grounds to continue to withhold the production.

The production to the Government, as you characterized it, is obviously low hanging fruit. There cannot be anything privileged in there.

At this point, I think that at least the correspondence suggested that there is an objection to producing all of what was produced to the Government because of a relevance argument.

Are you continuing to take that position?

MS. ARANGO: Yes. That has to do with the communications. And it is our position that when it comes to communications that I am separating communications from documentation. When it comes to communications it was much broader.

The Grand Jury subpoena was much broader and I believe we need to refine our search terms, which we can do. I believe we can accomplish that.

So we were talking about the first round of production being the documents. And like I said, I think that we provided a draft protective order. I don't remember the first time when we provided it, but it was a while ago.

And then we have had comments from them. We provided our comments about two weeks ago to Plaintiffs.

And then, just today, they had an additional change, which we have agreed to in the e-mail that is not part of the record before you because it happened just this afternoon and we have said that I think we are in agreement with it.

My only issue is producing documents that have confidential business information and data without a protective order and that is, I think, the only issue.

THE COURT: Okay. Except with respect to -- if I call it the Government production, you understand what I mean?

MS. ARANGO: Yes.

THE COURT: To the extent that it is your intention to

pare it down in some way, how much longer is that going to take?

MS. ARANGO: I think it is going to take as long as we can prepare search terms and do a standard review.

How long did that take us?

MR. BOYETT: A week.

MS. ARANGO: A week? About a week. And that has to do with the communications.

THE COURT: What was the volume of the Government production?

MS. ARANGO: The communications were -- I'm checking with Mr. Boyett. He believes that the communications were around 7,000 documents.

THE COURT: Pages or documents?

MS. ARANGO: Documents.

THE COURT: You Bates stamped numbered it, right?

MS. ARANGO: Yes.

THE COURT: What is the page range?

MS. ARANGO: I don't have the Bates stamps. I don't have the page range.

THE COURT: Okay. It is usually -- I didn't mean it to be a pop question. It is just that correspondence usually says attached please find Bates stamped --

MS. ARANGO: Yes.

THE COURT: -- one through blank and I thought that

that would be a very easy matrix. I did not intend it to be a trick.

MS. ARANGO: We have that information. I just don't have it in front of me.

THE COURT: Let me hear from Plaintiffs.

MR. FLOCH: Yes, Your Honor.

Miss Arango and her team are working very cooperatively. We did have a very cooperative meet and confer.

The issue remains that the low hanging fruit is still not with us and my understanding from the last hearing is that you had asked that production begin. It has not begun.

And we need the low hanging fruit to meet the Court's deadlines. And I think two areas that Your Honor picked up on, the data and the Government production, to us are the low hanging fruit. The data, we think, should be produced immediately.

THE COURT: The distinction that you are drawing between data and the production, let me just make sure that I understand because Miss Arango, likewise, separated data from communications.

So when you say data and Government production, are you referring to the data that is within the production to the Government or something else?

MR. FLOCH: Something else, Your Honor.

It may be in the Government production, but our

understanding is that the records that show the purchases from the fishermen, both in terms of the products, the prices, the weight, the name of the fishermen should be easily obtainable and it may have been produced to the Government.

If it wasn't produced to the Government, we still would request it and it is our belief that it is quite easy to obtain either because the Defendants have it internally in their own files, or our understanding is that the Fish and Wildlife Commission actually keeps this data. And the Defendants of Keys can just go to that website and just request all of that data.

And so we are looking for that data today if we can get it. It is necessary data for our class certification expert.

THE COURT: I am just trying to look through your correspondence and make sure that I have the right phraseology for the way that you are describing the data that is retrievable from on-line like that.

The data that they can just pull down or the data that you are saying that you should have today is either in response to which RFP, or how did you characterize it on the correspondence?

MR. FLOCH: Your Honor, I believe it is responsive to -- if you give me one second here.

RFP number 2, all transaction level data including

structured data reflecting each purchase of relevant products. And then it goes on to list some of the details that we believe will be in that structured data.

THE COURT: Ignoring the general objections that were nonetheless raised, the Defendants here, their response seems to say that it is going to produce documents sufficient to show the transaction level data for purchases of the relevant products from fishermen during the period of January 2023 to present.

Is it Plaintiffs' position that that response is adequate?

MR. FLOCH: No, Your Honor.

We had requested data going back to 2010. And in antitrust cases it is common to get -- especially data, structured data going back even much further than the allegations of the conspiracy.

In this case the conspiracy allegations say that in our complaint that it ranged from 2015 to 2023. We have requested data going back to 2010.

And it is our understanding from what is housed on the Fish and Wildlife Commission website that without any further information or authorization, a Defendant like Keys can pull data going back to 2014.

THE COURT: And again, when you say pull data, you mean data from the Fish and Wildlife website?

MR. FLOCH: Yes, Your Honor.

If that is where it is housed. If they have it on their own platforms and it is in substantially similar format, we are requesting that, too.

THE COURT: Okay. I am trying to understand the meet and confer leaves me a little confused about the status of data from 2015, 2017. What is your understanding?

MR. FLOCH: My understanding, Your Honor, was that we still did not visibility exactly into how far back the -- I'll call it data -- went on Keys' servers.

And so the correspondence that you see basically was a -- Mr. Brosnick was saying that perhaps they have data going back earlier than 2023 to 2020, and 2019, 2017, or 2015, but as of Wednesday, they did not have an answer for us about how far back the structured data went.

THE COURT: Okay. And you know, outlines and notes are very personal to the person who took them.

So I apologize for needing the assist as much as I do, but there is a bullet point that says the parties agree that the first step is to see what is actually available. Keys agreed to see how far back the servers go and what data exists before the FWC data from August 1 of 2019.

I think meet and confer was on the 4th?

MR. FLOCH: It was Wednesday, Your Honor, which I believe was the 4th.

THE COURT: Okay. So have you gotten any followup from Keys?

MR. FLOCH: Not on the time period that they have on their internal servers or internal databases about how far back it goes. Okay.

THE COURT: Okay. So, again, just to make sure that I understand exactly how to articulate the order, the data should be characterized as transactional; transaction level data.

Aside from the timeframe objection, the other limitation the Defendants have imposed is purchases of the relevant products from fishermen.

Do you agree that that is the appropriate scope?

MR. FLOCH: Yes, Your Honor.

But the term fishermen might be a little bit -- I don't want to say non-precise because there might be direct sellers who do not consider themselves fishermen. So we would ask that any orders say direct sellers of the relevant products to D and D -- sorry -- to Keys. I apologize.

THE COURT: All right. Miss Arango, first as to timeframe?

MS. ARANGO: So, as we outlined, Your Honor, the allegations of the amended complaint do not have, other than what is alleged regarding the conspiracy in the Dopico plea, which is from 2023 to 2025, there are no factual allegations of the conspiracy pre-dating that.

So even though they say the conspiracy goes back to 2015, and we have not yet filed our motion to dismiss, but I think we will be able to establish that there is no factual allegations to support that.

So we believe that we have at least a grounds for the time scope objection to 2023.

In our meet and confer we have agreed that we will produce the structured data. That is the reporting to FWC prior to that date as part of a negotiated production and a conciliation.

We used the August 1st, 2019 date, frankly, because that is the date that where the production to the Government of that data began. So it went from August 1st, 2019 to, I believe, this year.

So that is why we used that data and we will, with the entry of a protective order, we will provide that data.

THE COURT: Okay. Listen, let me just save you from having to repeat that.

The motion for a protective order is incumbent on you. If you move for it, if it is stipulated, chances are we will enter it immediately, but it is not an impediment to production . The production is going to be ordered with or without.

So what I am having trouble to make sure that I understand, though, your position on timeframe, I think I just heard you say that the reason that you advanced that as the

scope in your responses to the Plaintiffs' requests is because that is what you culled for the Government?

MS. ARANGO: Yes.

THE COURT: In connection with their criminal investigation?

MS. ARANGO: Correct.

THE COURT: Part of your objections is predicated on the difference between the scope of the criminal investigation and the scope of this civil case?

MS. ARANGO: Correct.

THE COURT: Okay. So while that production may be, as we have clarified ready to go back to 2023, is there another reason that the production should be limited to that timeframe in this case?

MS. ARANGO: The only reason in our view is that anything prior to 2023 is not relevant because the Plaintiffs' complaint does not set forth factual allegations establishing collusive conduct before 2023.

And the crux of their factual allegations have to do with the Dopico plea, which was a conspiracy that was alleged to have occurred from 2023 to 2025.

THE COURT: Let me pause and just ask, do you have a copy of the amended complaint close by?

MR. FLOCH: Yes, Your Honor.

THE COURT: Could you highlight what factual

allegations support your demand for discovery pre-dating back before it?

MR. FLOCH: Yes, Your Honor.

Not only do we plead that there was a conspiracy from 2015 -- sorry -- 2015 to 2023, there are at least three paragraphs about 2015 conduct; paragraph 71 through 74 -- sorry -- four paragraphs.

And I can hand a copy of the complaint to Your Honor if you would like.

THE COURT: Thank you. I have it in front of me.

I wanted to have us go over it together in open court so that it is not, you know, so that Miss Arango has the opportunity to tell me why that is not relevant for discovery.

It starts with just a historical discussion of what was happening in 2010.

"The competition was extinguished by 2015 when Defendants and their co-conspirators, having witnessed their profit margins erode due to rising ex-vessel prices, actively coordinated to crush its new competition.

Coordinating pricing and suppressed rates paid to fishermen and other direct sellers. By 2015 the Defendants had successfully consolidated and controlled a new entrance and implemented an agreement to set prices more uniformly."

Miss Arango, tell me what I am missing.

MS. ARANGO: I'm sorry. Let me just pull that up.

I can tell you that it is our position that this is insufficient factual allegations. It is just an allegation without factual basis.

THE COURT: Okay. That objection is overruled.

Now, I know that there has been some concern, a lot of concern, about timing because of your motion, which is now due on which date? Remind me, Mr. Floch.

MR. FLOCH: Your Honor, I believe it is March 2nd. Mr. Sadowsky will correct me if I'm wrong.

THE COURT: Okay. So just under a month.

And I do not mean to suggest that there is bifurcation of discovery. I am just mindful and appreciative of your comment that the team on the Defense side is working hard and so there is some triage in prioritization that has to occur. It is not like we can snap our fingers and it is done.

So you have identified the transactional data, which obviously exceeds the Government's production, which only goes back to '23 anyway.

So then, again, I want to put together an order that is as clear as it can be, can you articulate any other relief that you are seeking so that I can hear the Defendants' position on it?

We have talked about the production of the -- I am trying to think of the clearest way to say it. Documents that are responsive to the Plaintiffs' request and have already been

produced to the Government in response to a Grand Jury subpoena that would have to be produced immediately.

So to the extent that the Defense takes the position that their production to the Plaintiffs should be less than what they have already produced falls in your court to thin it out. However you think is appropriate, but not over the course of next week. That is going out on Monday.

So if you think that you need to pull from it, fine. If you cannot get it done by Monday, also fine, but you are producing it. So that's one.

The other one is going to be the data that is -- I mean, I'm sorry. Did you respond to the question that had been open since Wednesday about the in-house availability of data that goes back and how far versus your ability to pull from the FWC website as the Plaintiffs suggested? I am not sure that I had heard a response.

MS. ARANGO: So the data that is reported to FWC on a daily basis is available to Defendants.

I note I am not sure how long back that electronic data is available. We know that it is available as far back as August 1st of 2019 because that was the date of the beginning of that production that was made to the Government.

THE COURT: Wait. Okay. So now I am confused.

What is the 2023 date? I had heard you say that the Government's production that was made by Keys culled documents

from 2023 forward.

MS. ARANGO: No. The FWC structured data that Keys produced to the Government, the data started August 1st of 2019.

THE COURT: But so you did proffer a '23 date. Is that communications?

MS. ARANGO: No, I don't recall proffering a 2023 date.

THE COURT: Can I ask you the meaningfulness of the cutoff that you advance in your objections?

MS. ARANGO: Yes.

THE COURT: I heard you say that it was candidly tied to the production that you made to the Government.

Can you help me understand that proffer now?

MS. ARANGO: Yes.

THE COURT: Okay.

MS. ARANGO: It was tied to the -- the allegations of Plaintiffs' complaint and that the only factual basis set forth in Plaintiffs' complaint were those allegations that related to the facts set forth in the Dopico plea.

And that those other allegations, the ones in 70 to 74 do not provide a factual basis for -- they are simply allegations with no supporting facts prior to that date.

THE COURT: Miss Arango, I'm sorry.

Do you now know whether or not your production to the

Government, those 7,000 documents, do you know if they pre-date 2023?

MS. ARANGO: The structured data that we produced to the Government pre-dated 2023. It was August 1st of 2019 to the date of production.

THE COURT: Okay. All right. I took in my notes that you had proffered that the production to the Government was 2023 to present, but that is just wrong.

I misunderstood you?

MS. ARANGO: Yes.

THE COURT: Okay. So your production ran from 2019 through the date of the guilty plea?

MS. ARANGO: No, of the production to the Government in response to the Grand Jury subpoena.

THE COURT: Which you responded to on what date?

MS. ARANGO: I believe September.

THE COURT: Of this past year?

MS. ARANGO: Yes.

THE COURT: Okay. So almost present, but not quite.

MS. ARANGO: Correct.

THE COURT: Okay. All right. I am not sure how I misunderstood that. So August 1st of 2019 to September 2025 for data?

MS. ARANGO: Correct.

And just to be clear because I just want to make sure

that you understand the data that we are talking about is what was described by Mr. Floch as the data that is reported to FWC by Defendants.

And it includes, like Mr. Floch said, the fishermen, the date, the vessel, the purchase price, the weight, that is all reported to FWC and that is contained in basically an Excel spreadsheet.

THE COURT: Is it an a native document or is it static? Meaning, like did someone preserve it as it was transmitted or has someone pulled it down? Can you describe that Excel spreadsheet?

MS. ARANGO: It is taken from -- so that FWC has a software and, then, our client connects to that software and keeps all of that information that is reported.

So I am not sure. I am not like that technologically inclined. I believe that it is native, but I am not one hundred percent sure. So the data that is input and populated into the spreadsheet.

THE COURT: Sure.

What I meant was, is it dynamic? Meaning, could I go in and change an 8 to a 2 or is it locked and static? That's what I was really asking.

MS. ARANGO: I do not know the answer to that question.

THE COURT: Okay. We will find out.

But it sounds like that is a very low lift for the client to go and applying that same software and the date range that the Plaintiffs are asking for and simply download it into an Excel spreadsheet and turn it over.

MS. ARANGO: I do not know how far back.

Like I said, August 1st of 2019 we know for sure because it has been produced.

THE COURT: But applying a date range of 2010 will yield whatever is available. It is not like it is asking the client to go back and look somewhere else.

So, you know, the order will instruct the client to pull the data from FWC pursuant to the method you just described. To the extent it takes a different query or different steps than what you are advancing, I am relying on the explanation that you gave me in how I am going to articulate the order.

MS. ARANGO: Your Honor, on the issue of the protective order, we were seeking to get a stipulation.

If we need to move for a protective order, we will do so. That information is sensitive business information that we believe should be subject to a protective order.

THE COURT: I am not saying that you are wrong. I am just saying that it cannot hold up the production any longer.

Again, to the extent that that is water under the bridge, but when you say we would have moved the Court for it,

you are still expecting to -- it sounded like advance a joint motion for entry of a stipulated protective order; is that right, or is this just an agreement between the parties?

MS. ARANGO: We would have advanced a stipulated motion for a protective order for Your Honor to enter. That is standard and I think that that is what we had been working on.

THE COURT: None of that is problematic. It just has to either be done or foregone. It just cannot hold up the production. That's all. That is the only observation that I am making.

MS. ARANGO: Okay.

THE COURT: There is nothing wrong with have a stipulated protective order.

MS. ARANGO: Okay.

THE COURT: Okay. Hang on for a split second.

Okay. All right. Mr. Floch, anything else that you think needs to be specified in the order?

MR. FLOCH: Your Honor, besides the structured data that we have discussed extensibly, and I will call it the Government production of whatever it is, I don't know. I think those are the low hanging fruit here and in ordering those things to be produced very quickly would be helpful.

THE COURT: Monday.

MR. FLOCH: Thank you, Your Honor.

THE COURT: Well, let me think about this because I

think what I would suggest, I think that are there any other parties that are not present that are impacted by the protective order?

Because Judge Altonaga does not prefer to see discovery motions on her docket. So if it is stipulated, then you should advance it to me just via e-mail like you would your source materials in the Word format.

I will review it. If I make any changes, in all likelihood it would just be to -- sometimes parties include language that suggests that confidential information could be filed under seal and it cannot. You still have to file a motion to seal.

But, regardless, if you send it to me in your Word format document that it is stipulated, we will enter the order without need to file a motion. But if it is not stipulated, then it has to be, you know, then the Court has to decide whatever is not agreed upon.

What you can do if it is just a matter of we've agreed to everything except this provision, then you can advance it to me in an e-mail that says, you know, this is the Plaintiffs' or sorry, this is the stipulated protective order as far as we have gotten it. In red line you see what the Plaintiffs wants and we contest. In green you see what we want and the Plaintiffs contest.

I am just trying to make sure because if you file it

and Judge Altonaga strikes it, then that does not get you any closer to getting your protective order. So I would suggest, especially if it is agreed upon, just sending it to us in an e-mail.

MS. ARANGO: We have already agreed.

The co-Defendants have not. They received it today for their review; co-Defendant counsel.

THE COURT: Well, I do not mean to speak for or to the parties that are not present. To the extent that those Defendants need a protective order that is different than yours, then they can seek it, or they may decide that yours is adequate, but yours is the production that is at issue.

So I would support your decision to look out for your client and I would sign the protective order that you advance me that the Plaintiffs agree to.

MS. ARANGO: Okay.

THE COURT: You know, I mean, I do not know which provisions are causing issues. If you are prepared to talk about them, I can give you guidance on what I would do if it was disputed, but if you are not there --

MR. FLOCH: I do not think there is any provisions between the Plaintiffs and Keys. We have agreed.

THE COURT: Then I would send it to me in about an hour and we will enter it.

So I can understand and just based on the nature of

the requests, I can see that they would patently include confidential financial information and that would state good cause.

So I would not probably have any problem signing and putting it on the docket for you as soon as I get it by e-mail. Since we are going to characterize this as an oral motion it does not show up on the docket.

Okay. What if anything else, Mr. Floch?

MR. FLOCH: For today?

THE COURT: Yes.

MR. FLOCH: I think that is it.

THE COURT: Okay.

MR. FLOCH: The parties are working cooperatively. And like I said, Miss Arango's team has gotten us lots of information.

THE COURT: Okay.

MR. FLOCH: I do not want the record to show that that is not true because it is and we will continue to talk to them about other issues, but the low hanging fruit today is all the issues.

THE COURT: Good.

Okay. Then, we will make sure please that it comes to the Louis box and not anyone person in particular so that we can be responsive to it and we will enter it.

A short order will follow this hearing recommending

production -- well, noting that the Plaintiffs' motion to compel has been granted and that production has been ordered and with those two categories.

And the protective order is a separate document so that it won't be mentioned.

Is there anything else for today?

MR. FLOCH: No, Your Honor.

THE COURT: Miss Arango?

MS. ARANGO: No, Your Honor.

THE COURT: Okay. Good luck. You are all excused.

THE COURTROOM DEPUTY: All rise.

(Thereupon, the proceedings concluded.)

CERTIFICATE

I hereby certify that the foregoing transcript is an accurate transcript of the audiotape recorded proceedings in the above-entitled matter.

02/12/26

Bonnie Joy Lewis,
Registered Professional Reporter
CASE LAW REPORTING, INC.
7001 Southwest 13 Street,
Pembroke Pines, Florida 33023
954-985-8875